J. JONES, J.,
concurring in part and dissenting in part.
I concur in Part II of the Court’s opinion but dissent with respect to Part III. In my view, the Release/Hold Harmless/Indemnity/Assumption of Risk Agreement (Agreement) does not contain language effective to release Northwest Nazarene University (NNU) from liability for its own negligent actions; the release language in the Agreement is overly broad; and it would be contrary to public policy to provide immunity under the particular facts of this case.
Although this Court disfavors contracts purporting to absolve parties from certain duties and liabilities, contracting parties are free to enter into such agreements if they comply with strict criteria. As this Court summarized in Jesse v. Lindsley, 149 Idaho 70, 75, 233 P.3d 1, 6 (2008):
Freedom of contract is a fundamental concept underlying the law of contracts. Rawlings v. Layne & Bowler Pump Co., 93 Idaho 496, 499, 465 P.2d 107, 110 (1970). A contracting party may absolve himself from certain duties and liabilities under the contract, subject to certain limitations. Anderson & Nafziger v. G.T. Newcomb, Inc., 100 Idaho 175, 178, 595 P.2d 709, 712 (1979). However, courts look with disfavor on such attempts to avoid liability and construe such provisions strictly against the person relying on them, especially when that person is the preparer of the document. Id. Clauses which exclude liability must speak clearly and directly to the particular conduct of the defendant which caused the harm at issue. Id.
Where a party seeks to obtain contractual absolution from the consequences of that party’s own negligence, the release language must be particularly clear. As stated in 57A American Jurisprudence, 2d Negligence § 52 (2004):
Because the law does not favor contract provisions that relieve a person from his or her own negligence, and such provisions are subject to close judicial scrutiny, a greater degree of clarity is required to make such provisions effective. The exculpatory provision must be expressed in clear, explicit, and unequivocal language showing that this was the intent of the parties. The wording of such an agreement must be so clear and understandable that an ordinarily prudent and knowledgeable party to it will know what he or she is contracting away; it must be unmistakable.
American Jurisprudence continues the discussion in section 53:
To be effective, the intentions of the parties with regard to an exculpatory provision in a contract should be delineated with the greatest of particularity, and the clause must effectively notify the releasor that he or she is releasing the other person from claims arising from that person’s own negligence.
An exculpatory clause will be given effect if the agreement clearly and unambiguously expresses the parties’ intention to exonerate by using the word “negligence” and specifically including injuries definitely described as to time, place, and the like. Thus, the better practice is to expressly state the word “negligence” somewhere in the exculpatory provision. However, a specific reference to the “negligence” of the maker of the clause or agreement is not required if the clause clearly and specifically indicates an intent to release the defendant from liability for a personal injury caused by the defendant’s negligence, if protection against negligence is the only reasonable construction, or if the hazard experienced was clearly within the contemplation of the provision. However, words conveying a similar import must appear; the provision must specifically and explicit *668 ly refer to the negligence of the party seeking a release from liability. A preinju-ry release will not cover negligence if it neither specifically enumerates negligence, nor contains any other language that could relate to negligence.
A general release will not bar claims outside the parties’ contemplation at the time it was executed. For example, a claim for negligence will not be barred by using broad and sweeping language, as by an agreement to release from “any and all responsibility or liability of any nature whatsoever for any loss of property or personal injury occurring on this trip.” Thus, an exculpatory clause must clearly set out the negligence for which liability is to be avoided.
The parties to a release need not have contemplated the precise occurrence that caused the plaintiffs injuries but rather may adopt language to cover a broad range of accidents by specifying injuries involving negligence on the part of the defendant.
Id. § 53.
The Agreement addresses four subjects— release, hold harmless, indemnity, and assumption of risk. The first paragraph of the Agreement, entitled “Release,” is a general release of liability,[3] whereby participants in NNU’s Challenge Course Adventure Program (Program) release and waive claims against NNU and its agents and employees for property damage or bodily injury arising out of the Program. The word “negligence” does not appear’ anywhere in the Release. The second paragraph of the Agreement is a hold harmless/indemnity provision,[4] whereby the participant “agrees to defend, indemnify and hold harmless” NNU and its agents and employees from liability incurred due to participation in the Program “whether caused by the negligence of the Releasees or otherwise.” Thus, the participant is obligated to defend and hold harmless the releasees against claims arising out of his or her participation in the Program. This paragraph specifically includes indemnity for claims alleging negligence on the part of NNU and its agents and employees. The last paragraph deals with assumption of risk,[5] stating that the pai’ticipant is aware that the course may be hazardous and that participants assume the risk of property damage and bodily injury. However, as with the Release, this paragraph makes no mention of negligence on the part of NNU and its agents and employees.
It is significant that only the hold harmless/indemnity paragraph of the Agreement includes a provision relating to the negligence of NNU. The word “negligence” appears nowhere else in the Agreement, particularly not in the Release nor in the assumption of risk paragraph. It is important to keep in mind that a hold harmless/indemnity clause does not operate as a bar to a claim in the same way as a “release” or “assumption of risk” clause might. So, where the party seeking immunity faces the double whammy of our consti’uetion principles — construing release provisions strictly against the person relying on them and requiring such provisions to speak clearly and directly to the particular instrumentality that caused the harm — I simply cannot find that the release language here is sufficient to waive Morrison’s claim. NNU could have included a provision in the Release absolving it and its agents and employees from liability, but it did not. It could have done likewise in the assumption of risk paragraph, but it did not. Where such language is specifically included in one paragraph dealing with specific subject matter *669 and not in the other paragraphs, both of which deal with other specific subject matter, I think we ought to give weight to that fact, particularly when required to construe such agreements against the avoidance of liability.
Therefore, in my view, the release paragraph of the Agreement is insufficient to immunize against claims asserting injury for negligent acts by NNU and its agents and employees. In my estimation, NNU had a duty to operate the program in a non-negligent manner and Morrison has asserted sufficient facts to survive summary judgment as to whether NNU breached such duty. Morrison claims that he was not properly instructed on how to scale down the climbing wall and that the person holding the rope, which is apparently designed to keep a participant from falling, was not properly instructed and supervised in performing that task. According to Morrison:
I had very little knowledge of climbing before [the accident]. I trusted and relied that the people running the course would properly instruct me and the people who were holding the rope that allowed me to scale down the wall. I do not believe that they gave me nor Donna Robbins, who was holding my rope, adequate instruction before this event nor do I believe that they adequately supervised Donna in properly handling the rope while I descended the wall.
The person holding the rope, Donna Robbins, agreed that she had not been properly instructed nor supervised. According to her affidavit, “I did feel that I had not been given adequate training to act as the belayer and I felt that I was neglected by the employees at the Rope Course when I was needing help.” In her statement made immediately after the accident, which was incorporated into her affidavit, she expanded:
The female assistant on site asked me to balet [sic] if I wasn’t going to climb the wall. I wasn’t comfortable working the equipment but I knew I should be a part of the team and help [belay], I remember feeling like I was thrown in there and did not receive any further instruction other than where to hold my hands. After she strapped me in I was good to go. Soon she realized I was having trouble knowing what to do and informed me that I needed to pull the rope tight and slide the extra rope through my other hand to make it tight. She then placed another girl to my right and instructed her to coil the rope. I was the only one baleting [sic] and had one girl to my right holding the extra rope. As soon as they pulled the [ladder] away and Paul started climbing, I began to have trouble with the rope. The assistant assured me I was strapped down to the pole behind me and that I needed to walk forward away from the pole until I felt it was tight enough to not leave any slack. As soon as Paul reached the middle of the wall, his legs began to get tired and he would rest a little. But every time he would stop to rest, the rope pulled me into the air and the others around were laughing and joking around about the [sight] of me and my feet being off the ground and my body being pulled into the air. At first, it was comical but I felt like I couldn’t control him. I knew he had to keep climbing or else this strain on me would begin to hurt. So I just cheered him on. I looked around and everyone was just smiling so I figured I wasn’t going anywhere and there was nothing to worry about. Paul looked down and looked a little worried. He asked me if I was ok. I said yes. When Paul finally got to the top, he rang the bell and was ready to let go. When he did, if felt like an extreme pull on me and the assistant came quickly to briefly explain what to do. She told me to hold onto the [brake] (that also releases the rope). I think she thought she was explaining it to me — but she wasn’t. I told her I didn’t know how to use it. She said “its really easy,” just make sure you pull down the level.” She was walking away from me as she was saying this and she seemed very busy with other people. I didn’t think it would be too difficult. As I pulled the lever, Paul began to come down fast and I honestly don’t remember what I was thinking. I tried to grab the rope but it just stung my fingers and I knew I couldn’t stop it that way. I kept trying to figure it out quickly. The girl to my right *670 was helpless as well. The rope was just flying out her hands. I looked up and Paul’s feet, then butt, hit the rocks very fast and head hit very hard on the wooden frame around the rocks.
My feeling throughout the rock-climbing activity was that I was alone and assigned to do it because I had to. I wasn’t comfortable at all but the assistant felt I was well taken care of. Even though I didn’t answer her twice when she asked for volunteers, so she called me out and handed me the [belay]. But I did want to be a part of the team and help but had never done it before and was pretty intimidated.
Even if we were permitted to import the specific reference to negligent conduct from the hold harmless/indemnity paragraph into the Release, that paragraph suffers from another infirmity. It is overly broad. It purports to release NNU and its agents and employees from any claims for property damage or bodily injury “however caused, resulting from, or arising out of or in any way connected with his/her participation in or use of the Northwest Nazar ene University Challenge Course Adventure Program.” The sweeping nature of the provision runs afoul of the specificity requirements noted in sections 52 and 53 of American Jurisprudence. This Court has found a similar all-encompassing provision in a lease agreement to be overly broad. In Jesse v. Lindsley, we dealt with an exculpatory clause that attempted “to relieve the landlord of liability for any type of injury, wherever it may occur.” 149 Idaho at 76, 233 P.3d at 7. We held, “The clause is too broad and does not speak clearly and directly to the particular conduct of the defendant intended to be immunized,” citing Anderson & Nafziger, 100 Idaho 175, 178, 595 P.2d, 709, 712 (1970). We stated:
While we have not considered the question of the enforceability of an overbroad exculpatory clause, we have considered the issue of enforceability of an overbroad contract provision in another area where a contractual provision is disfavored and strictly construed — covenants not to compete in contracts of employment. See Freiburger v. J-U-B Engineers, Inc., 141 Idaho 415, 420, 111 P.3d 100, 105 (2005). A covenant not to compete is reasonable and enforceable only if the covenant “(1) is not greater than necessary to protect the employer in some legitimate business interest; (2) is not unduly harsh or oppressive to the employee; and (3) is not injurious to the public.” Id. Applying the same principle here, it appears that the language absolving Lindsley of any liability for any occurrence anywhere on his property is simply too broad.
Id. at 76-77, 233 P.3d at 7-8.
In its opinion, the Court nicely summarizes some of our pre-Jesse cases regarding the degree of specificity required in a lease provision, and in my view none of those cases preclude the result I suggest here. In Lee v. Sun Valley Co., 107 Idaho 976, 695 P.2d 361 (1984), the plaintiff was injured when the saddle on a rented horse slipped, causing the horse to buck. Id. at 977, 695 P.2d at 362. The Court found that the plaintiff’s action was precluded by an agreement he signed acknowledging that he assumed the risk of riding and holding the defendant “harmless from every and all claim which may arise from injury, which might occur from use of said horse and/or equipment.” Id. Although the Court articulated little reasoning for its holding, a fall from a horse due to a loose saddle is a danger inherent in horseback riding itself. Thus, the agreement’s language was sufficient to put the plaintiff on notice of that risk. Of interest, however, is that the release specifically identified the “equipment” as a potential source of injury, which is not the case here.[6] In H.J. Wood *671 Co. v. Jevons, the Court evaluated a sales contract for an irrigation pump stating the seller “shall not be liable for damage or for consequential damage, particularly including loss or damage for diminution or failure of crops ... whether due to improper installation or performance of the machinery or otherwise.” 88 Idaho 377, 378, 400 P.2d 287, 289 (1965). The plaintiffs claims for crop loss in that ease all stemmed from the allegation that “the pump never functioned properly” and the consequences of that malfunction, which is clearly and directly contemplated by the “performance of the machinery” language in the agreement. See id. Thus, the Court correctly applied the rule.
Another irrigation equipment contract case, Rawlings v. Layne & Bowler Pump Co., was similar. 93 Idaho 496, 465 P.2d 107 (1970). There, the claim for crop loss was based on negligent installation of pumping equipment, and the Court barred the claim based on an agreement exculpating the seller from liability for consequential damage “due to installation ... of the property sold hereunder.” Id. at 497, 465 P.2d at 108.[7] Although the particular negligent conduct was not addressed, further specificity was not necessary to put the buyer on reasonable notice of the claim he was waiving. Id. Buying any item under a contract specifically limiting liability for defects in installation clearly brings to mind the-discrete array of possible installation-related conduct that entails. Such a contract does far more to notify the signer than simply including blanket language barring liability for any type of negligent conduct imaginable.
Similarly, in Steiner Corp. v. American District Telegraph, the defendant contracted with the plaintiff to perform two discrete services — to install and maintain a fire detection system. 106 Idaho 787, 683 P.2d 435 (1984). When the defendant failed to check the batteries of the system for eight months, the system failed to detect a fire in the plaintiffs building. Again, the Court found that such negligence fell under an exculpatory clause holding the defendant harmless for “loss or damage due ... to occurrences ... which the service is designed to detect or avert” resulting from “performance or nonperformance of obligations imposed by this contract or from negligence” of the defendant. Id. at 789, 683 P.2d at 437. This agreement specifically spoke to the alleged conduct by expressly referring to the discrete duties under the contract — to install and maintain. In signing the agreement, the plaintiff undoubtedly understood he was giving up claims for fire damage arising from failure to maintain the system, which reasonably included checking the batteries.
Conversely, in Anderson & Nafziger, the Court refused to find that a sales agreement for irrigation pivots contemplated liability for crop loss caused by delay in delivering the pivots, based on a strict reading of the agreement’s language. 100 Idaho at 178, 595 P.2d at 712. Although the agreement contained blanket language stating that “[t]he Seller will not be liable for damage of any kind, particularly including loss or damage for diminuation [sic] or failure of crop,” the Court held that the agreement did not apply. Id. The Court stated, “A reading of the total clause indicates that the clause is aimed at limiting the seller’s liability for crop loss which is caused by installation or repair work done by seller.” Id. With a loose reading, the Court might have found that the blanket language exempting liability “for damage of any kind” extended not only to that caused by installation and repair, but also by delay in delivery. However, the Court declined such a broad reading, focusing strictly on the language in the contract.[8]
*672 The upshot of these pre-Jesse cases is that where the dangers or risks inherent in a particular undertaking are, or should be, apparent to a reasonable person and where the release agreement employs clear and direct language to negate liability for such risks or dangers, the release will be effective to shield the releasee from liability. On the other hand, where a reasonable releasor cannot be expected to comprehend the risk or danger that results in injury and where the release does not contain language that speaks directly to limitation of liability for injury caused by such risk or danger, the release will not be enforced.
In the situation at hand, it cannot be said that the danger of falling from the rock wall was not readily apparent to any reasonable person. Morrison would surely have known that he could lose his grip or footing and fall. However, the activity involved a danger that was not so readily apparent. This activity involved equipment and a procedure that may have appeared on the surface to alleviate or eliminate the risk. The belaying rope, like a trapeze artist’s safety net, was there, apparently to protect participants from the danger of a fall. This certainly would give a participant a certain measure of comfort and well being — knowing that the element of danger might well be alleviated or eliminated by the safety equipment. It is one thing to expose a participant to the “dangers inherent” in a particular activity and ask him to waive a consequent claim for damages, but it is quite another to give the participant the illusion of protective measures — thereby providing a false sense of security — and then fail to properly implement those protective measures. It is akin to a bait and switch. If protective measures are carried out in a competent manner, then an accident occurring in the course of the proceedings cannot be held against the sponsor. However, if those protective measures are inherently inadequate, by reliance on untutored or incapable personnel in their handling, the sponsors should not be shielded from responsibility by a waiver signed by an unwitting participant.
It makes sense to encourage sponsors of risky activities to adopt safety measures designed to alleviate or eliminate the risk to participants. It is not particularly good policy, however, to allow sponsors to escape liability when those safety measures are handled in an incompetent or negligent manner, unless participants are clearly put on notice that safety measures or equipment may not provide the mai-gin of safety that one might reasonably anticipate. Nothing in the Release here indicates the employment of “equipment,” as the language in Lee did, nor of the possibility that any safety equipment might be operated in a faulty manner. Sponsors should be encouraged to adopt safety measures, but they should be held accountable where those measures are performed in a negligent fashion.
In the past, this Court has not been reluctant to embrace concepts of this nature, designed to provide redress where it may not have been previously available. For instance, the Court has adopted the doctrine that, “[ejven when an affirmative duty generally is not present, a legal duty may arise if ‘one voluntarily undertakes to perform an act, having no prior duty to do so.’ ” Baccus v. Ameripride Services, Inc., 145 Idaho 346, 350, 179 P.3d 309, 313 (2008). “In such case, the duty is to perform the voluntarily-undertaken act in a non-negligent manner.” Id. As with a voluntarily assumed duty, it makes good sense and policy to require that an activity sponsor who purports to make a risky activity safe, by the apparent incorporation of protective measures, be required to ensure the protective measures are carried out in a non-negligent manner or provide specific warning to participants that a risk of negligence in that regard inheres in the activity.[9]
*673 For all or any one of the foregoing reasons, I would vacate the judgment of the district court on the ground that the Agreement was ineffective to shield NNU from liability for Morrison’s claim. I would therefore remand for further proceedings.

. According to Black's Law Dictionary, a "release” is "[t]he relinquishment or concession of a right, title, or claim.” Black’s Law Dictionary 1403 (9th ed.2009).

. According to Black's, a "hold-harmless clause” is synonymous with an "indemnity clause," which is "[a] contractual provision in which one party agrees to answer for any specified or unspecified liability or harm that the other party might incur.” Id. at 800, 837-38.

.According to Black's, “assumption of the risk” is ”[t]he principle that one who takes on the risk of loss, injury, or damage cannot maintain an action against a party that causes the loss, injury, or damage.” Id. at 143. Although implied assumption of the risk has been abolished as a defense in Idaho, this Court still recognizes that express assumption of risk may preclude a negligence claim. Salinas v. Vierstra, 107 Idaho 984, 989-90, 695 P.2d 369, 374-75 (1985).

. In this regard, a case cited in section 53 of American Jurisprudence is relevant. In Beardslee v. Blomberg, 70 A.D.2d 732, 733, 416 N.Y.S.2d 855 (N.Y.App.Div.1979), a spectator at a stock car race volunteered to take part in a "Powder Puff Derby,” a stock car race for women. When the spectator’s car struck a retaining wall of the race track, she alleged the defendant raceway was negligent in "providing her with an unsafe vehicle, a defective helmet, and in failing to supply her with a fire suit.” Id. The defendant relied on a release she had signed to bar her claim (the language of which is not entirely quoted in the opinion), but the New York Supreme Court, Appellate Division, stated:
The release absolves the defendants from liability for any injury plaintiff might sustain while
*671 in the "restricted area", which includes the race track proper. It does not, however, specifically refer to equipment furnished by the defendants. Releases from liability for negligence are closely scrutinized and strictly construed, and a release general in its terms will not bar claims outside the parties’ contemplation at the time it was executed_Further-more, since the release herein is not entirely free of ambiguity, an issue of fact exists as to whether the risk of faulty equipment or the failure to furnish essential equipment was within the contemplation of the parties at the time it was executed....

Id.

. The contract later specifically identified negligence of the seller as a possible cause. Id.

. Another case, Empire Lumber Co. v. Thermal-Dynamic Towers, Inc., also shows the Court taking a closer look at an exculpatory clause, al *672 though the result there was more obvious. 132 Idaho 295, 971 P.2d 1119 (1998). In Empire Lumber, a lessee sought to apply a lease provision to excuse its liability for a fire allegedly caused by its negligence. Id. The Court disagreed because the lease merely stated, "Except for reasonable wear and tear and damage by fire or unavoidable casualty, Lessee will at all times preserve said premises in as good repair as they now are or may hereafter be put to....” Id. at 297, 971 P.2d at 1121. As the Court properly found, that clause clearly only contemplated incidental or unavoidable damage — not negligence. Id.

. As we have noted on a number of occasions, "Public policy may be found and set forth in the *673 statutes, judicial decisions or the constitution.” Jesse v. Lindsley, 149 Idaho at 75, 233 P.3d at 6 (quoting Bakker v. Thunder Spring-Wareham, LLC, 141 Idaho 185, 189, 108 P.3d 332, 336 (2005)).